James DEPPE, William Deppe, William Clinton Deppe, and Charles Stephen Aggert, Plaintiffs-Appellees,

v.

Herman TRIPP and Howard Weitekamp, Defendants-Appellants.

Nos. 86–2893, 86–2894 and 87–1524.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 4, 1987.

Decided Dec. 21, 1988.

Rehearing En' Banc Denied.

John L. Swartz, Giffin, Winning Lindner Cohen & Bodewes P.C., Springfield, Ill., Jeffrey N. Cole, Jeffrey Neal Cole, Ltd., Chicago, Ill., for defendants-appellants.

Duane D. Young, Long Rabin & Young, Ltd., Springfield, Ill., for plaintiffs-appellees.

Before COFFEY and KANNE, Circuit Judges and ESCHBACH, Senior Circuit Judge.

KANNE, Circuit Judge.

The plaintiffs-appellees filed this three count civil action based upon their purchase of stock in the White Mountain Corporation. Count I alleged securities fraud, Count II alleged a conspiracy to commit securities fraud, and Count III alleged a cause of action under the Racketeer Influenced Corrupt Organizations Act ("RICO"). Herman Tripp was named as a defendant in all three counts and Howard Weitekamp was named as a defendant in the second and third counts. A jury returned verdicts in favor of each individual plaintiff-appellee. Herman Tripp was held liable for $25,000.00 in damages in each of Counts I and III. Howard Weitekamp was held liable for $25,000.00 in damages in Count III. Both defendants-appellants were held jointly liable for $25,000.00 in damages in Count II.

Pursuant to the plaintiff-appellees' post-trial motions, the district court trebled the damages under Count III, pursuant to 18 U.S.C. § 1964(c), and awarded limited attorneys' fees. After a hearing, the district court also denied the defendants-appellants' motions for judgment notwithstanding the verdict and for a new trial. Herman Tripp and Howard Weitekamp appeal the district court's entry of judgment upon those verdicts. Howard Weitekamp also appeals the district court's order granting the plaintiffs-appellees' motion for attorneys' fees. We affirm the district court.

## I. BACKGROUND

This action stems from sales of securities in the White Mountain Corporation ("White Mountain"), an Illinois corporation formed in 1983. Ostensibly, White Mountain was a venture seeking to develop the commercial use of diatomaceous earth.[1] Appellant Tripp had been involved in numerous prior entrepreneurial activities and had agreed to arrange a $1.5 million financing package to aid White Mountain in developing its diatomaceous earth project. Appellant Weitekamp was White Mountain's corporate secretary.

William Bernard Deppe ("Bernard Deppe") is a retired farmer and is the father of James Deppe and William Clinton Deppe ("Clint Deppe"). The fourth plaintiff, Stephen Aggert, is a friend of the Deppe family. This group (the "Deppes") was introduced to Howard Weitekamp and Joe Trello, White Mountain's President, by Bob Garvey who was one of Bernard Deppe's neighbors. Trello unveiled the wonders of diatomaceous earth to Bernard Deppe, hoping that Deppe would loan money to the project on an interim basis until Herman Tripp obtained the $1.5 million financing package. Bernard Deppe agreed to arrange for a bank to provide a $50,000.00 line of credit. This line of credit was never used and it expired. However, shortly after the line of credit expired, Bernard Deppe, at the request of Trello and Weitekamp, loaned White Mountain $27,500.00 for sixty days. This loan was not repaid.

Sometime early in July of 1983, Herman Tripp told Bernard Deppe that he was going to sell some of the stock that he held in White Mountain.[2] Bernard Deppe was led to believe that the proceeds from this sale would provide further interim assistance to White Mountain until the $1.5 million arrived. A few days later, on July 12, 1983, all four plaintiffs-appellees met at Howard Weitekamp's office to purchase White Mountain stock. Joe Trello, Herman Tripp, and Howard Weitekamp all were present. Bernard Deppe received credit for his loan to White Mountain toward his stock purchase. James Deppe, Clinton Deppe, and Stephen Aggert each wrote personal checks to White Mountain in the amount of $25,000.00. Herman Tripp disapproved of this arrangement, insisting that the checks be made payable to him instead of White Mountain. Nevertheless, he assured the Deppes that the money was to go to the corporation. After the plaintiffs-appellees wrote new checks as instructed, Herman Tripp issued stock certificates, which also included the signature of Howard Weitekamp.

In addition to funds intended for the corporation instead going to a "shareholder,"[3] several other irregularities embraced this transaction. For example, Herman Tripp admitted that he tendered no consideration for his own "shares" in the corporation. Additionally, White Mountain's attorney—its sole incorporator—testified at trial that no authorization existed to issue stock at the time the Deppes purchased the stock. Thus, the shares issued on July 12, 1983 to the Deppes were not legally authorized shares of the White Mountain Corporation. Further, the attorney-incorporator testified that in fact he had told Howard Weitekamp that issuing shares in the corporation was unlawful at that time. Finally, even if shares could have been issued legally, the attorney-incorporator's personal authorization was required before any shares could be issued to new shareholders —authorization never received by Herman Tripp or Howard Weitekamp. Summa-

---

1. Diatomaceous earth or diatomite is a fine, white or cream colored siliceous earth compound used commercially as a filtering agent, a filler, absorbent, clarifier, and a thermal insulator. Webster's Third New International Dictionary (1986). The defendants also planned to use it as a natural, non-toxic insecticide.

2. In early July, Herman Tripp requested that he be issued stock in White Mountain as a showing of good faith for his commitment to obtain the $1.5 million financing package. Although unauthorized to issue stock, Joe Trello executed stock certificates which were blank, generic certificates purchased at a local store. White Mountain's attorney and sole incorporator never authorized the execution. Thus, Herman Tripp never held stock in White Mountain.

3. *See id.*

rized, the defendants-appellants, contrary to their representations, sold the plaintiffs-appellees stock that the corporation had not authorized or issued. Further, the funds went not to the corporation, but instead to Howard Weitekamp's personal account. Finally, although some portion of the funds were deposited in the corporation's account eventually, a substantial portion of the funds were spent by both Herman Tripp and Howard Weitekamp.[4]

Within days, Joe Trello again complained that the corporation needed money. At that time, the plaintiffs-appellees realized that contrary to Herman Tripp's representations White Mountain's corporate coffers had not received the funds. Shortly thereafter, Herman Tripp informed the Deppes that he and "Weitekamp [had] decided to leave White Mountain Corporation and form their own partnership [to develop diatomaceous earth]." (Tr. 127). Herman Tripp offered the Deppes a two percent interest in this new venture, White Mountain Mining and Mineral Company ("White Mountain II").[5] Herman Tripp further offered to give the Deppes credit for their investment in the old White Mountain Corporation, but stated that he would need another $25,000.00 in cash from Bernard Deppe. Wisely, the Deppes declined the offer.

At the time Herman Tripp offered the Deppes stock in White Mountain II, another slight problem existed. Herman Tripp's offer to the Deppes occurred in September, 1983. However, plaintiffs' exhibit 150, a certificate from the office of the Idaho Secretary of State, indicates that White Mountain Mining and Mineral Company had been dissolved on November 30, 1982.

In November of 1983, the plaintiffs-appellees filed a two count suit in federal court. Herman Tripp and Howard Weitekamp were named as defendants. Count I of the original complaint alleged that Herman Tripp sold stock in White Mountain by making misrepresentations. In addition, his sales were not *de jure* corporate acts and thus constituted securities fraud in violation of the Securities Exchange Commission's Rule 10b–5. The second count alleged that the defendants-appellants had conspired to fraudulently sell stock in White Mountain to the plaintiffs-appellees. The complaint later was amended to charge both Weitekamp and Tripp with a third count. Count III alleged that the defendants were conducting an enterprise (White Mountain) through a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1961 *et seq.* The Deppes sought treble damages and attorneys' fees under this count.

In the district court, Herman Tripp and Howard Weitekamp were represented jointly by attorneys William Ted Lewis and Michael W. Hogan. Prior to trial, the defendants-appellants filed motions to dismiss all three counts. The motions were denied and the case subsequently was tried to a jury. A verdict was returned in favor of all four plaintiffs-appellees and against Herman Tripp upon Counts I, II, and III, and against Howard Weitekamp upon Counts II and III.

After the trial, the plaintiffs-appellees filed a motion to amend the judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. Specifically, as to the jury verdict upon the RICO charges, they sought to have their individual damage awards of $25,000.00 trebled pursuant to 18 U.S.C. § 1964(c). They also sought reasonable attorneys' fees. The district court granted their motion, trebling their damage awards and awarding attorneys' fees in the amount of $33,093.00. The defendants-appellants filed a motion for judgment notwithstanding the verdict and, in the alternative, a motion for a new trial. These motions were denied.

The defendants-appellants, now individually represented and neither by their trial counsel, appeal from the judgments entered in this matter. Howard Weitekamp also filed a notice of appeal from the order

---

**4.** Howard Weitekamp eventually transferred $10,000.00 to White Mountain's account.

**5.** Tripp was the chief executive officer and Weitekamp was the vice president and a director of White Mountain II.

granting attorneys' fees. However, because Howard Weitekamp failed to brief this matter fully upon appeal, the issue is waived. *Andree v. Ashland County*, 818 F.2d 1306, 1310 n. 5 (7th Cir.1987).

## II. ANALYSIS

Both Herman Tripp and Howard Weitekamp have alleged numerous errors of sufficient magnitude, in their opinion, to warrant reversal of the damage awards. The defendants-appellants are dissatisfied with plaintiffs' closing argument, certain evidentiary admissions, and the jury instructions regarding the conspiracy and RICO counts. None of these purported errors prompted objection at trial. The defendants-appellants also focus upon the sufficiency of the evidence and the adequacy of the pleadings, as well as their trial attorneys' alleged conflict of interest. We now address each of the issues.

### A. *The Civil Plain Error Doctrine*

■ At trial, the defendants-appellants failed to object to what they now perceive to have been erroneous jury instructions, inadmissible evidence, and prejudicial remarks during closing argument. None of these matters were properly preserved as issues reviewable upon appeal. Nevertheless, both Herman Tripp and Howard Weitekamp seek adoption and application of a plain error doctrine for those alleged errors. Thus, we first must address the manner in which a plain error doctrine applies to civil litigation—if such a doctrine applies at all.

Numerous interrelated policy considerations must guide our analysis. For example, Rule 52(b) of the Federal Rules of Criminal Procedure contains a plain error doctrine which operates to preserve errors to which no objection was tendered during federal *criminal* litigation.[6] *See United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985); *United States v. Wynn*, 845 F.2d 1439, 1442 (7th

Cir.1988). However, no counterpart to Criminal Rule 52(b) exists in federal *civil* litigation. *See* C. Wright & A. Miller, Federal Practice and Procedure: *Civil* § 2558, at 674 (1971). The conspicuous absence of a plain error doctrine provision in the Federal Rules of Civil Procedure leads us to believe that a plain error doctrine ordinarily is not available in civil litigation.

Some courts have applied a plain error doctrine under exceptional circumstances, invariably expressing a desire to avoid any miscarriage of justice. However, when errors in fact have been committed and have not been preserved by counsel for review upon appeal, a remand for new trial or a reversal is not the only avenue available to prevent perceived injustice. For example, a party may institute an independent action against the trial attorney whose omission(s) rendered the issue(s) unappealable. "A party with privately retained counsel does not have any right to a new trial in a civil suit because of inadequate counsel, but has as its remedy a suit against the attorney for malpractice." *Watson v. Moss*, 619 F.2d 775, 776 (8th Cir.1980); *accord Mekdeci v. Merrell Nat'l Labs*, 711 F.2d 1510, 1522–23 (11th Cir.1983); *see also Wolfolk v. Rivera*, 729 F.2d 1114, 1120 (7th Cir. 1984) ("there is no constitutional right to effective counsel in a civil case"). Thus, unlike criminal litigation where significant personal interests are at stake, little need exists to adopt a plain error doctrine in civil litigation.

A related line of authority also exists, holding that a party who chooses his counsel freely should be bound by his counsel's actions. *Geiger v. Allen*, 850 F.2d 330, 334 (7th Cir.1988) (citations omitted) (arising under Fed.R.Civ.P. 4(j)); *Inryco, Inc. v. Metropolitan Eng'g Co.*, 708 F.2d 1225, 1233 (7th Cir.), *cert. denied sub nom. Metropolitan Erecting Co. v. Inryco, Inc.*, 464 U.S. 937, 104 S.Ct. 347, 78 L.Ed.2d 313 (1983) (arising under Fed.R.Civ.P. 60(b)). "[I]f the attorney's conduct was substan-

---

**6.** Rule 52(b) states:

Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

Fed.R.Crim.P. 52(b).

tially below what is reasonable under the circumstances, the client's remedy is a suit for malpractice." *Inryco,* 708 F.2d at 1233 (quoting *Schwarz v. United States,* 384 F.2d 833, 835–36 (2d Cir.1967)); *see also Mekdeci,* 711 F.2d at 1523. In *Link v. Wabash R.R.,* 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) (arising under Fed.R. Civ.P. 60(b)), Justice Harlan commented:

> There is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have "notice of all facts, notice of which can be charged upon the attorney."

370 U.S. at 633–34, 82 S.Ct. at 1390 (quoting *Smith v. Ayer,* 101 U.S. 320, 326, 25 L.Ed. 955 (1879)).

Finally, recent cases have referred to the inequity borne by the non-erring party when he is forced to incur the expense of a new trial occasioned by his opponent's error. *Davis v. Consolidated Rail Corp.,* 788 F.2d 1260, 1267–68 (7th Cir.1986); *Parrett v. City of Connersville,* 737 F.2d 690, 698 (7th Cir.1984), *cert. dismissed,* 469 U.S. 1145, 105 S.Ct. 828, 83 L.Ed.2d 820 (1985). This concern is valid. Requiring a non-erring party to bear the burden of his opponent's errors may not be reasonable in many circumstances and in fact may constitute a miscarriage of justice.

After weighing these considerations, we conclude that a plain error doctrine, at best, has an extremely limited application in civil litigation. We now turn to the specific errors alleged in this case.

### 1. Jury Instructions

The defendants-appellants contend that certain jury instructions given by the dis-

trict court were erroneous and that we should employ a plain error doctrine to review their impropriety. As indicated earlier, there is a conspicuous absence of a plain error doctrine provision in the Federal Rules of Civil Procedure. However, an historical survey shows some uncertainty in earlier cases about the application of a plain error doctrine to civil jury instructions. *See, e.g., Exxon Corp. v. Exxene Corp.,* 696 F.2d 544, 549 (7th Cir.1982) (courts of appeals "have claimed the power to order a new trial for an error in instructing that was not raised in a timely fashion"); *Iskander v. Village of Forest Park,* 690 F.2d 126, 130 (7th Cir.1982); *Shearson Hayden Stone, Inc. v. Leach,* 583 F.2d 367, 370 (7th Cir.1978). *Compare Moore v. Telfon Communications Corp.,* 589 F.2d 959, 966 (9th Cir.1978) (holding that no plain error doctrine exists in civil litigation); *Bock v. United States,* 375 F.2d 479, 480 (9th Cir.1967) (same). More recent cases acknowledge that past decisions have applied the doctrine to civil cases, but these recent cases have attempted to confine the prior applications to their extraordinary factual situations. *See Davis,* 788 F.2d at 1267–68 (failure to object to jury instructions); *Walker v. Maccabees Mut. Life Ins. Co.,* 753 F.2d 599, 602 (7th Cir.1985) ("Only in most exceptional circumstances will we allow a civil appellant to make a nonjurisdictional argument for the first time." (citations omitted)); *Parrett,* 737 F.2d at 698 (failure to object to jury instructions) (stating that "the circumstances must be extraordinary, this circuit does not recognize a blanket plain-error exception in civil cases"). Even more recently, this court has held that "[n]o doctrine of 'plain error' protects parties from the consequences of their decisions in civil litigation." *Williamson v. Handy Button Mach. Co.,* 817 F.2d 1290, 1295 (7th Cir.1987) (failure to object to jury instructions).

Rule 51 of the Federal Rules of Civil Procedure specifically commands that "[n]o party may assign as error the giving or failure to give an instruction *unless he objects thereto before the jury retires* to

consider its verdict." (emphasis added).[7] Furthermore, in *City of Springfield v. Kibbe*, 480 U.S. 257, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987) (per curiam), the Supreme Court refused to review an argument concerning the propriety of a certain jury instruction where the petitioner failed to object to the jury instruction in the district court. The Court first stated the general rule that it "ordinarily will not decide questions not raised or litigated in the lower courts." *Id.* 107 S.Ct. at 1115. The Court then stated, "That rule has special force where the party seeking to argue the issue has failed to object to a jury instruction . . . ." *Id.*

■ The Federal Rules of Civil Procedure clearly address this issue. Therefore, we now hold that in civil cases a plain error doctrine is not available to protect parties from erroneous jury instructions to which no objection was made at trial.

### 2. Evidentiary Errors

Herman Tripp also alleges that errors regarding evidentiary admissions were committed at trial. Tripp argues that he was prejudiced by testimonial evidence concerning a disputed loan transaction between himself and Bob Garvey, the plaintiffs-appellees' neighbor who originally introduced the parties to each other. At trial, a witness testified that Bob Garvey lent $35,000.00 in cash to Tripp. In turn, Herman Tripp gave the money to his son. Thereafter, Tripp's son flew to the Bahamas, strapping the money to his body to avoid detection during the flight. Apparently, this evidence was offered to show a pattern of racketeering activity. No objection was made to this testimony, but Herman Tripp again argues that a plain error doctrine should apply. We disagree.

We begin by noting that although civil jury instructions are outside the scope of the plain error doctrine, alleged evidentiary errors may not be subject to the same blanket unavailability. Rule 103(d) of the Federal Rules of Evidence states that

"[n]othing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court." While not binding, the advisory committee's notes observe that the wording of this rule comes from Criminal Rule 52(b), and suggests that this rule is available regarding the admission of evidence in civil cases. Moreover, we have said that there is a limited application of a plain error doctrine to remedy unpreserved evidentiary errors. *See, e.g., Young v. Rabideau*, 821 F.2d 373, 376 (7th Cir.1987) (stating that "the plain error doctrine allows reversal in spite of the lack of an objection at trial if 'the trial court's admission [or exclusion] of this evidence was a conspicuous error that was so likely to have changed the result that a retrial is necessary to avoid a miscarriage of justice' " (citations omitted) (footnote omitted)), *cert. denied,* —— U.S. ——, 108 S.Ct. 263, 98 L.Ed.2d 221 (1987); *Ellis v. City of Chicago*, 667 F.2d 606, 611 (7th Cir.1981) ("A party challenging the exclusion [or inclusion] of evidence has the burden of demonstrating that his substantial rights have been prejudiced by the exclusion [or inclusion]." (citations omitted)); *Platis v. Stockwell*, 630 F.2d 1202, 1205 (7th Cir. 1980) (stating that the discretion to invoke such a doctrine "should be exercised *sparingly* and only in *exceptional cases* " (citations omitted) (emphasis in original)).

■ Thus, although the same policy considerations discussed previously weigh against adopting a plain error doctrine in any aspect of civil litigation, we hold that the plain error doctrine may be available to review evidentiary rulings to which no objection was made at trial *if* a moving party can demonstrate (1) that exceptional circumstances exist, (2) that substantial rights are affected, and (3) that a miscarriage of justice will result if the doctrine is not applied.

■ In this case, Herman Tripp has not convinced us that exceptional circumstanc-

---

7. Rule 30 of the Federal Rules of Criminal Procedure essentially is identical to Rule 51 of the Federal Rules of Civil Procedure.

es existed; nor did the testimony, which apparently was offered to show a pattern of racketeering activity, prejudice any of his substantial rights. Finally, Herman Tripp has not shown that the admission of this evidence created a miscarriage of justice which requires us to reverse the jury's verdict or to grant a new trial. Failure to demonstrate any one of the foregoing factors would have been sufficient to preclude the application of the plain error doctrine. Herman Tripp failed on all three. As a result, we will not apply a plain error doctrine with regard to the testimony concerning Herman Tripp's son and the flight to the Bahamas.

### 3. Closing Arguments

Herman Tripp also argues that the plaintiffs' closing argument was so improper and prejudicial that it constitutes plain error and warrants reversal of the jury's verdict. He argues that plaintiffs' counsel attempted to appeal to the jury's base instincts, thereby skewing the deliberation process, and that counsel in fact succeeded. He alleges that plaintiffs' counsel sought to align himself with the jury by asking jurors to "trust" him, improperly injected his own opinion on the character of the defendants, and suggested to the jury that he had other information not presented at trial which led him to believe that certain witnesses were reliable and others were not.[8] However, Herman Tripp offers no explanation for his trial counsel's failure to

object to the purported improper remarks, other than to decry his attorney's overall ineffectiveness.[9]

■ We have "not hesitated in the past to bind a party to its strategic decision to sit silent in the face of claimed error by refusing relief when the party complains because the result is unfavorable." *Gonzalez v. Volvo of Am. Corp.*, 752 F.2d 295, 298 (7th Cir.1985). In *Gonzalez*, as well as in *Michaels v. Michaels*, 767 F.2d 1185 (7th Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 797, 88 L.Ed.2d 774 (1986), we noted that a party's silence at a time when an objection appears appropriate often may reflect that party's tactical posture—perhaps the party feared that a contemporaneous objection would incur hostility from the jury.[10] "[R]isky gambling tactics such as [not objecting] are usually binding upon the gambler." *Michaels*, 767 F.2d at 1203; *Gonzalez*, 752 F.2d at 298; *accord Williamson*, 817 F.2d at 1295–96 (discussing failure to object to jury instructions) ("Failure to object may even have been part of [the appellant's] litigation strategy.... [S]econd-guessing is not a ground on which to set verdicts aside."). The general policy considerations discussed above coupled with a court's inability to discern strategy from poor execution makes us extremely reluctant to adopt a plain error doctrine in this area of civil litigation.

Relatively few cases in this circuit have addressed the availability of a plain error doctrine in remedying purported errors

---

**8.** For example, plaintiffs' counsel stated:

Do you seriously believe that's true[?] Would you seriously believe it if you read it in a magazine? I think not. I don't think any of us would.

(Trial Transcript at 567). He later stated:

[W]e think they deserve punishment for that. We think they need to be taught a lesson. We think that a message has to go out that we are not going to tolerate that type of business activity.

(Trial Transcript at 571).

**9.** After plaintiffs' closing argument, Herman Tripp's attorney began by stating:

Boy that was powerful, Mr. Long. I—that's a hard act to follow. I was certainly impressed. I know you all were, and that's one of the things that really puts the burden— makes it hard work for you.

(Trial Transcript at 576).

**10.** If a party fears that an objection during closing argument will incur the jury's wrath, he still must preserve his objections to any allegedly prejudicial comments. For example, a nearly contemporaneous objection made at the bench at the close of an opponent's argument, clearly stating the grounds for the objection, would preserve the matter for appellate review.

Such a procedure would also afford the trial court an opportunity to attempt to cure the claimed error through use of a jury instruction. "In the absence of objection and the giving to the trial court an opportunity to attempt to ameliorate the situation by a curative instruction, we must assume that the jury had the ability to separate inflammatory and emotional rhetoric from the relevant facts in the case." *Gonzalez*, 752 F.2d at 298.

made during closing arguments. Several recent opinions have stated that a plain error doctrine may be available if such errors resulted in "fundamental error." *See, e.g., Katapodis v. Koppers Co.,* 770 F.2d 655, 661 (7th Cir.1985); *Michaels,* 767 F.2d at 1203; *Gonzalez,* 752 F.2d at 298. Cases suggesting the availability of this doctrine originally relied upon statements found within Wright & Miller's and Moore's federal procedure treatises, with little or no discussion of the doctrine or its parameters. *See, e.g., Sadowski v. Bombardier, Ltd.,* 539 F.2d 615, 618 (7th Cir. 1976) ("In the absence of plainly prejudicial error, ... a party may not sit silently by, letting claimed error occur and then seek relief if the result is unfavorable. 9 Wright & Miller, Federal Practice and Procedure § 2472, at 455 (1971)"), *cited in Gonzalez,* 752 F.2d at 298; *Christian v. Hertz Corp.,* 313 F.2d 174, 175 (7th Cir. 1963) (citing 5 Moore, Federal Practice 1902–05 (2d ed. 1951)), *cited in Gonzalez,* 752 F.2d at 298. Many of the cases cited in these treatises adopted the plain error doctrine from *criminal* cases, where a common law plain error doctrine developed to insure criminal defendants that they would not be deprived of life or liberty because of their attorney's failure to object to harmful or prejudicial error. For example, some cases have relied upon a statement made by the United States Supreme Court that "appellate courts 'in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 239, 60 S.Ct. 811, 851, 84 L.Ed. 1129 (1940) (citation omitted), *cited in Gonzalez,* 752 F.2d at 298. However,

these cases have failed to discuss or even acknowledge that the Supreme Court's statement arose in the context of criminal proceedings.

As we stated above, the Federal Rules of Criminal Procedure now specifically include a plain error provision, reflecting the obvious need to protect a party's substantial liberty interests. Such interests normally are not at stake in civil litigation, as the absence of a plain error doctrine in the Federal Rules of *Civil* Procedure indicates. We do not believe that earlier cases suggesting a "fundamental error" exception to the civil plain error doctrine bar actually intended to create its availability in civil cases. Such reasoning finds support in the analysis applied in those cases. Although suggesting that such an exception might exist, no recent case has been willing to characterize any unpreserved alleged error as "fundamental," and each has declined to apply a plain error doctrine.[11]

■ In civil cases where economic and property interests are usually at stake, as opposed to criminal cases where more substantial liberty interests are involved, a plain error doctrine is unneeded. As we stated at the outset of our discussion, sufficient means exist to remedy any prejudice which a civil litigant may have experienced as a result of his attorney's failure to object to allegedly improper remarks during closing argument. Therefore, we now hold that no plain error doctrine exists to remedy errors which are alleged to have occurred during closing argument. To preserve an error for appellate review, a party must object to those errors before the trial judge submits the case to the jury for deliberation. Consequently, Herman

---

11. In *Gonzalez,* for example, the opposing counsel had stated:

   You will have a chance to do something about this all. You ladies and gentlemen, as jurors, are the representatives of our community. You, by your verdict today in this court, will be able to set safety standards that you want applicable for our country. You will be able to tell these defendants, "We will not tolerate you putting a defective product out on the market which will cause the death of a loved

one and break the back of another—because we don't want it to happen to our loved ones." 752 F.2d at 298.

   We characterized the opposing counsel's conduct as "grossly immoderate." Further, we indicated that we were unable "to state affirmatively that [counsel's remarks] to the jury might not have influenced the eventual verdict improperly." *Id.* Nevertheless, we declined to characterize the claimed errors as "fundamental" and refused to apply a plain error doctrine.

Tripp's claims are beyond the scope of our review.[12]

### 4. Conflicts of Interest

Howard Weitekamp contends that he was denied a fair trial because his counsel had a conflict of interest. He argues that because he and Herman Tripp hired and were represented by the same attorneys, a conflict of interest was created which prevented him from receiving adequate and competent representation. Again, the defendant-appellant argues for application of a plain error doctrine. We hold that a plain error doctrine is not available in such cases.

■ Here, both defendants-appellants voluntarily agreed to representation by the same trial counsel. From the record, the defendants-appellants clearly possessed the financial resources to secure separate trial counsel had they so desired (and as they have done upon appeal). As we have observed, where privately retained counsel performs inadequately (and this would include continuing to represent two or more parties notwithstanding a conflict of interest), the proper remedy is not a new trial, but rather an action against the attorney for malpractice. *See Mekdeci*, 711 F.2d at 1522, 1523; *Watson*, 619 F.2d at 776. Additionally, nothing in this case warrants imposing upon the Deppes the burden of a new trial due to the alleged conflict arising from the joint representation of two civil co-defendants.

Further, we do not believe that the court or the plaintiffs-appellees' counsel had a duty to oppose this purported conflict of interest. Howard Weitekamp cites Ill.Rev. Stat., 1987, Ch. 110A, Rule 5–105 to support his argument that a conflict of interest warrants a reversal. However, Rule 5–105 is not directed to the bench or the opposing counsel, but rather it is directed to counsel possessing the apparent conflict of interest.

■ The plain error doctrine is inapplicable when it is the complaining parties who could have taken action to prevent the perceived problem. Here, the complaining parties freely chose their counsel and a decision to cure any putative errors by this court would impose unreasonable burdens upon the parties who are faultless.

■ Furthermore, even if we were to recognize a very limited application of the plain error doctrine, this case is an inappropriate candidate for its application. The defendants-appellants have failed to demonstrate how the alleged errors caused a miscarriage of justice. Howard Weitekamp has not demonstrated that this putative conflict caused any actual harm, and instead he merely speculates upon possibilities. When viewed in light of the strong record supporting the verdict, such speculation is insufficient to warrant the application of a remedial doctrine designed to cure only the most egregious errors, or to warrant the grant of a new trial.

### B. *Sufficiency of Evidence*

The defendants-appellants also challenge the sufficiency of the evidence presented at trial. The evidence presented in this case indicated that four victims were defrauded of at least $25,000.00 each in at least two separate transactions—Bernard Deppe's $27,500.00 loan to White Mountain by check dated May 28, 1983 and Clint Deppe, James Deppe, and Stephen Aggert's purchase of White Mountain shares on July 12, 1983. Additionally, Bernard Deppe loaned a total of $28,000.00 more to White Mountain in a series of three separate transactions occurring between June 30, 1983 and August 23, 1983. Finally, Herman Tripp and Howard Weitekamp offered to take $25,000.00 and the worthless shares in White Mountain in exchange for shares in White Mountain II, a dissolved corporation.

Howard Weitekamp contends that insufficient evidence exists to support a finding

---

**12.** Even if we were to adopt a plain error doctrine in such cases—which we expressly decline to do—Herman Tripp has failed to demonstrate how the plaintiffs' counsel's remarks constitute "fundamental" error. In this case, opposing counsel's remarks may have pressed the bounds of propriety, but they do not rise to the level of fundamental error—the remarks rejected in *Gonzalez* were far more prejudicial than those in issue here.

that he conspired to commit securities fraud as alleged in the second count of the plaintiffs' complaint. Herman Tripp similarly contends that insufficient evidence exists to support the RICO violation alleged in the third count of the plaintiffs' complaint because the evidence demonstrated no pattern of racketeering activity. Herman Tripp does not challenge the sufficiency of the evidence which exists to support the securities fraud claim alleged in the first count of the plaintiffs' complaint. We find that the evidence was sufficient to support the jury's verdict under both Counts II and III.

We first examine the evidence presented concerning the purported RICO violations. In *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985), the Supreme Court discussed the "pattern of racketeering activity" necessary to prove a RICO violation. The Court stated that, at a minimum, two acts are necessary to establish this pattern. *Id.* (discussing RICO's legislative history). The Court further indicated that in some cases two acts might not be sufficient to establish a "pattern." *Id.* A pattern was described as "criminal acts that have the same or similar purposes, results, participants, victims or other methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* (quoting 18 U.S.C. § 3575(e)). Subsequent decisions by this court have fleshed out the contours of the pattern requirement. In *Morgan v. Bank of Waukegan*, 804 F.2d 970 (7th Cir.1986), this court set forth an extensive framework for resolving pattern questions:

> The acts must demonstrate both a continuity and a relationship in order to constitute a pattern of racketeering activity. However, the proposition that the predicate acts must always occur as part of separate schemes in order to satisfy the continuity aspect of the pattern requirement focuses excessively on continuity, and therefore cannot be accepted as a general rule....
>
> ... In order to be sufficiently continuous to constitute a pattern of racketeering activity, the predicate acts must be ongoing over an identified period of time so that they can fairly be viewed as constituting separate transactions, *i.e.*, "transactions 'somewhat separate in time and place.'" [citations omitted]. Relevant factors include the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries. However, the mere fact that the predicate acts relate to the same overall scheme or involve the same victim does not mean that the acts automatically fail to satisfy the pattern requirement.

804 F.2d at 975–76.

Subsequent cases provide further illustration of how this concept applies to a variety of factual situations. In *Lipin Enters. v. Lee*, 803 F.2d 322 (7th Cir.1986), the plaintiff alleged that the defendants had defrauded him as part of a single stock transaction. This court held that the plaintiff failed to allege sufficiently a pattern of racketeering activity, because there was one scheme, one transaction (albeit attended by numerous fraudulent documents), one victim, and one injury. In *Elliott v. Chicago Motor Club Ins.*, 809 F.2d 347 (7th Cir.1986), we held that the pattern requirement was not met where five family members alleged that the defendant attempted to defraud them in the settlement of their claims where all the claims arose from one accident and were made under one insurance policy. Finally, in *Marks v. Pannell Kerr Forster*, 811 F.2d 1108 (7th Cir.1987), this court held that the plaintiff failed to establish the pattern requirement where there was one victim and one occasion of criminal activity.

▬▬▬▬ However, no requirement exists that the plaintiff must suffer an injury from two or more predicate acts, or from *all* of the predicate acts. *Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, 809 (7th Cir.1987). Thus, a RICO verdict can be sustained when a pattern of racketeering acts existed, but when only one act caused injury. Stated differently, merely because one of the racketeering acts was

not successful does not mean that it is unavailable to establish a pattern.

In *United States v. Horak*, 833 F.2d 1235 (7th Cir.1987), a single scheme existed to bribe local officials to award a contract for garbage collection. Three payments were made under the scheme. This court held that those actions were sufficient to establish the pattern element. Furthermore, in *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1304–05 (7th Cir.1987), this court held that a single scheme involving a single victim who was injured nineteen times constituted a pattern of racketeering activity. The court stated that "[w]e find that the repeated infliction of economic injury upon a single victim of a single scheme is sufficient to establish a pattern of racketeering activity for purposes of civil RICO." *Id.*

■ In the case before us, certainly two racketeering acts occurred—the stock sold to the Deppes on July 12, 1983 and the offer to exchange those shares and $25,-000.00 for shares in the dissolved White Mountain II. Further, it is arguable that three racketeering acts occurred—the two mentioned above and the $27,500.00 loan by Bernard Deppe by check dated May 28, 1983. Only the July 12, 1983 and May 28, 1983 acts resulted in injury. Applying these facts to the guidelines set out above, we conclude the evidence clearly was sufficient to support the RICO verdict. Here, four victims were defrauded upon two occasions as part of a single scheme. The defendants further compounded matters by their unsuccessful attempt to effect the sale of securities in White Mountain II, a dissolved corporation. We hold that these acts sufficiently establish a pattern of racketeering activity for civil RICO purposes.

■ Howard Weitekamp argues that the evidence was insufficient to support the verdict on Count II for conspiracy to commit securities fraud. We are unconvinced by his arguments. The evidence establish-es that Howard Weitekamp deposited the $75,000.00 received from the Deppes on July 12, 1983 into his own account.[13] Further, Howard Weitekamp signed the phony stock certificates that were issued in exchange for the Deppes' checks of $75,-000.00 and Bernard Deppe's $27,500.00 loan, even though White Mountain's attorney advised him that no legally authorized shares existed. In addition, Howard Weitekamp, along with Joe Trello, convinced Bernard Deppe to loan White Mountain $27,500.00 which was never repaid. The evidence shows that Howard Weitekamp was active in procuring these funds along with Herman Tripp and further that he knew the issued shares were not legally authorized. Taken together, the evidence was sufficient to allow a reasonable jury to conclude that Howard Weitekamp had conspired to commit securities fraud.

### C. *Adequacy of the Pleadings*

Howard Weitekamp also contends that the original pleadings were insufficient to state a claim under any count. This issue was presented to the district court before trial in a motion to strike and in a motion to dismiss. Both motions were denied as being without merit. We agree. A review of the pleadings reveals that the complaint adequately stated a claim for relief and that the evidence at trial conformed to the pleadings.

### III. CONCLUSION

With respect to jury instructions, the plain error doctrine is not a viable concept in civil litigation. Although a plain error doctrine may be available to preserve evidentiary errors for appellate review if a moving party can demonstrate that exceptional circumstances exist, that substantial rights are involved, and that a miscarriage of justice will result if such a doctrine is not applied in his case, that is not the case

---

**13.** Even though the checks were made out to Herman Tripp, the testimony at trial was that Howard Weitekamp deposited them into his own bank account and then disbursed portions of the proceeds to, *inter alia,* Tripp.

here. We decline to adopt a civil plain error doctrine when a party has failed to object to opposing counsel's allegedly prejudicial closing arguments or when a purported conflict of interest of counsel is an issue. Finally, the pleadings were adequate and the evidence was more than sufficient. The judgment of the district court is AFFIRMED.*

---

* Pursuant to Circuit Rule 40(f) this opinion has been circulated among all judges of this court in regular active service and Judge Eschbach, a senior judge and member of the panel which heard this case. The following judges did not favor a rehearing en banc on the question of plain error in civil cases: BAUER, CUMMINGS, WOOD, Jr., POSNER, COFFEY, FLAUM, EASTERBROOK, MANION, and KANNE, *Circuit Judges,* and ESCHBACH, *Senior Circuit Judge.*

Circuit Judges CUDAHY and RIPPLE requested an en banc hearing. Judge RIPPLE also submitted a dissent from the denial of rehearing en banc which follows:

RIPPLE, *Circuit Judge,* dissenting with respect to the denial of rehearing *en banc* pursuant to Rule 40(f). Circuit Rule 40(f) is a salutary mechanism by which panel decisions containing major developments in the law of the circuit are submitted to the entire court before release. Its purpose is to ensure stability and certainty in the development of law by assuring the bench and bar that the entire court approves of the holding. Those who read an opinion bearing the court's endorsement under Circuit Rule 40(f) have a right to expect that the rationale as well as the holding have the court's approval.

Making some sense out of the so-called plain error doctrine in civil cases is indeed a worthwhile task and I find a great deal of the panel's thoughtful effort not only unobjectionable but commendable. However, two aspects of the panel's opinion require further clarification.

1) In dealing with the plain error doctrine in the context of closing argument, the panel justifies the absence of a need for a plain error rule as follows:

As we stated above, the Federal Rules of Criminal Procedure now specifically include a plain error provision, reflecting the obvious need to protect a party's substantial liberty interests. Such interests normally are not at stake in civil litigation, as the absence of a plain error doctrine in the Federal Rules of *Civil* Procedure indicates.

Opinion, *supra* at 1364. If the discussion ended there, one might conclude that the panel was simply drawing a distinction between civil and criminal litigation. However, the discussion continues:

In civil cases where economic and property interests are usually at stake, as opposed to criminal cases where more substantial liberty interests are involved, a plain error doctrine is unneeded.

Opinion, *supra* at 1364 (emphasis supplied). Again, the panel *may* simply be drawing the distinction between civil and criminal cases. However, its statement is not so limited. Rather, it recites the broader proposition that our civil docket is basically concerned with economic and property issues when, in fact, much of that docket involves important issues of individual liberty.

2) With respect to conflicts of interest, the text does not make sufficiently clear whether the opinion sets forth a rule for all cases or whether the holding is limited to the record. Certainly, there will be instances when the conflict of interest is not readily apparent to lay persons but quite apparent to the trial judge. We cannot assume, of course, that the lawyer with the conflict will disclose his conflict. This issue, I suggest, deserves further thought and elucidation before an opinion with a Circuit Rule 40(f) endorsement is released.

I therefore respectfully dissent from the denial of rehearing en banc.